McKesson vs. Sherman and another.

## McKESSON vs. SHERMAN and another.

*January 17 — February 8, 1881.*

*(1) Replevin; amendment of complaint to increase damages. (2-4) Evidence. (3) Impeaching witness. (5) Amendment of answer.* REVERSAL OF JUDGMENT. *(6) For omission to instruct.* CONTRACTS: FRAUD. *(7) What fraudulent purpose in contract will prevent a recovery.*

1. Defendants in replevin having entitled themselves to a return of the property pending the action, and having disposed of it, there was no error in permitting plaintiff to amend the complaint by increasing the alleged value of the property.

2. Exceptions to the rulings of the court below respecting evidence in this case are disregarded or overruled here, on the grounds that the same evidence was in fact given, or the facts otherwise established, so that the rulings became immaterial; or that the questions ruled out were put upon cross examination without anything in the direct examination to authorize them; or that they asked the witness's opinion as to the *intentions* of other persons; or that they called for statements of a party in his own favor; or that they made remote collateral issues; or that they were based upon hypothetical facts not sufficiently supported by evidence; or that they related to the value of the property at a time too remote, or called for admissions of a party as to the value of such a character that, if made at a proper time, he would not be bound by them; or that for other reasons they were irrelevant or immaterial.

3. A witness cannot be impeached by mere proof that he was once *charged* with a crime in judicial proceedings.

4. A party who claims that, he being at the time unable to read a certain instrument, it was misread to him by the other party, and his signature to it thus fraudulently obtained, may make parol proof of its character as read to him; and this even where the instrument itself, as actually executed, may be put in evidence and fully identified.

5. A refusal at the close of the evidence to permit one of two defendants to amend his answer by inserting matter of estoppel against the plaintiff, which is set up in the separate answer of the other defendant, even if it was not entirely within the discretion of the court, cannot be treated as error where the jury found against both defendants.

6. The court having correctly charged that the written instrument under which defendants obtained possession of the property in suit, did not itself transfer the title to them, in language which cannot be regarded as preventing the jury from considering that instrument, in connection with the other facts, as *evidence* upon the question of such transfer, the judgment will not be reversed merely because the jury were not distinctly instructed that they might consider it as such evidence.

7. The property in dispute was a trotting horse; plaintiff and the horse had been expelled by the National Trotting Association; and there was evidence that the design of the transaction by which defendants came into possession was to deceive said association as to the present ownership of the horse, and procure a revocation of such sentence of expulsion against it. Both parties claimed that the expulsion was wrongful, and there was no evidence to the contrary. *Held*, that these facts do not show any legal fraud, such as would preclude plaintiff from recovering the possession.

APPEAL from the Circuit Court for *Walworth* County.

Defendants appealed from a judgment in favor of the plaintiff. The case is stated in the opinion.

For the appellants there were separate briefs by *J. R. Doolittle* and *J. R. Doolittle, Jr.*, in behalf of the defendant *Sherman*, and an additional brief signed by *John B. Simmons* as attorney for *Reynolds*, and by *Bennett & Sale*, of counsel for both defendants; and there was oral argument by *J. R. Doolittle* and *J. R. Bennett*.

*J. V. & C. Quarles*, for the respondent.

ORTON, J. This is an action of replevin for the recovery of·

a fast trotting horse, known as Billy Basteder, or Charley Ford, of the alleged value of $6,000. The defendants jointly answer, denying the title of the plaintiff, and alleging the ownership of the horse in themselves. The defendant *Reynolds* makes separate answer, that they purchased the horse of one Charles M. Ford, of the state of Ohio, who claimed to be its owner, and that the plaintiff represented to them that he had sold it to said Ford, and that Ford was the lawful owner, and that thereupon the horse was delivered to them by the express assent of the plaintiff, and that they have retained its possession since, and that the plaintiff is therefore estopped from now setting up title to the property as against them. The horse was taken by the writ and returned to the defendants upon their giving the bond required by the statute, and the defendants have since sold and disposed of it, and the judgment, therefore, is for the value of the property. The testimony tended to prove, and the jury therefore must be presumed to have found, the following facts: Previous to May, 1878, the plaintiff had owned the horse a considerable length of time, and had tried its speed as a trotter on several tracks in Wisconsin by its name of Billy Basteder and other stable names, and it had developed quite a high rate of speed, and had become valuable as a trotting horse, to the knowledge of the defendants. In May, 1878, the plaintiff sold the horse to one Charles M. Ford, of the state of Ohio, a distant relative by marriage, for something over $4,000, and afterwards, during the early part of that season, it was put upon the track in that state by the name of Charley Ford, and was successful in winning large premiums in trotting races at Oil City and other places in the state of Pennsylvania, by the same name, where he was entered through the agency of the plaintiff. By order of the Oil City Driving Park Association, the National Trotting Association at Hartford, Connecticut, expelled the horse, its driver, one George Brown, and the plaintiff, according to a rule of that association, for the fraudulent entry of

the horse at Oil City under the name of Charles M. Ford. By this expulsion the horse lost his right of entry upon any track under the supervision of the association, as a trotting horse, and its value greatly lessened, and the expulsion was on the pretext and by reason of the charge that the horse had been entered under a wrong name, and in a class or grade below its previous trotting record. These charges were denied by the plaintiff as well as by the defendants as being untrue; but the plaintiff appeared indifferent whether the horse should be restored or remain under such expulsion, while the defendants professed to take a great interest in its restoration by a reversal of the decision of the association. In July, 1878, the plaintiff purchased back the horse from said Ford, and thereafter had possession of it, and brought it back to Wisconsin; but Ford had not executed any bill of sale of it to the plaintiff. This is the condition of the horse and *its title*, and these are the circumstances, when its pretended and apparent sale to the defendants took place in October, 1878.

The defendants represented to the plaintiff that if they had the legal title to the horse in form, and could be reputed its owners, they could have it restored by the National Trotting Association, and they would at once take measures to accomplish such a result, and thereby fraudulently induced the plaintiff to cause the nominal title of the horse to be placed in them, by the following bill of sale from Charles M. Ford, who was its reputed owner when its expulsion took place:

"BELLEVUE, OHIO, August 17, 1878.

"*J. G. Sherman,*

"*J. C. Reynolds,*

"Bought of Chas. M. Ford, one gray gelding, 6 years
old, known as Charley Ford ................ $2,000
"Subject to incumbrance held against said horse by *J. C. McKesson.*

"Rec'd payment.        C. M. FORD."

About the same time the defendants presented to the plaintiff a receipt to be signed by him, and the plaintiff, being unable to see sufficiently to read writing without glasses, and not having any at the time, could not and did not read such receipt, and it was then read by one of the defendants, and represented as expressing merely the receipt of the horse by the defendants, and of a $2,000 promissory note, payable in one year, given by the defendants nominally to Ford, by the plaintiff, therefor, and an agreement that, on the plaintiff delivering up to the defendants the note, they should deliver up the horse to plaintiff, and upon the defendants delivering up the horse to the plaintiff he should deliver to them the note. The receipt or agreement in evidence, and which was actually signed by plaintiff, and which was so fraudulently procured, is as follows:

"GENEVA LAKE, WIS., August 17, 1878.

"I, J. C. McKesson, hereby agree with J. G. Sherman and J. C. Reynolds, that for the consideration of a certain note I hereby agree to give the said note for a certain gray horse known as Charley Ford, owned by said Sherman and Reynolds, and the said exchange must be made within one year from this date."

The note reads as follows:

"CHICAGO, August 17, 1878.

"One year after date we promise to pay to C. M. Ford or bearer two thousand dollars, value received, payable at Chicago, Ill.

[Signed]                                     "J. G. SHERMAN,
                                             "J. C. REYNOLDS,
                                             "J. C. McKESSON."

The bill of sale, the note, and the receipt or agreement, were all dated back to August 17, to make the ownership of the horse by the defendants the more apparent, in order that they might, as such pretended owners, the more readily and easily cause its reinstatement upon the records of the National Trot-

ting Association. Afterwards the defendants took measures, by affidavits and otherwise, to so reinstate the horse, and with the prospect and probability of success, all of the time disclaiming to the plaintiff any real ownership of it, and admitting and fully recognizing personally to the plaintiff his real title and ownership, and pretending to act for him and on his behalf, and at his expense, in so endeavoring to cause its reinstatement; and finally, in March, 1879, when the plaintiff suspected the good faith of the defendants in these transactions, and that they fraudulently intended to claim the real ownership of the horse, and made demand of it, and tendered back the said note, the defendants refused to deliver it to the plaintiff and to receive said note, and for the first time claimed to the plaintiff that they were the real owners of it; and then the plaintiff brought this suit. These are substantially the facts which the jury must be presumed to have found; and from these facts they must be presumed to have found also that these pretended transactions, and the procuring of this pretended and apparent sale of the horse to the defendants from the plaintiff, were, on their part, a fraudulent scheme to obtain wrongfully and without adequate consideration this property of the plaintiff, but that in fact there was no real sale of the property to them by the plaintiff, and that the plaintiff was all the time the real owner, and that the real design and purpose of the defendants were to defraud the plaintiff of his horse, and not to hold the merely apparent title to it for the purpose of having it reinstated, which was the sole purpose of such apparent sale on the part of the plaintiff.

It is proper to say that, respecting the real nature of this transaction, the testimony was very conflicting, and the jury must have found that which supported the theory of the plaintiff the more credible and of greater weight than that which tended to support the theory of the defendants; and there does not appear to be such clear preponderance of the evidence against their verdict as would justify this court to

review the facts and reverse the finding of the jury upon mere questions of fact.   The facts which the jury must be presumed to have found have been the more fully stated, in order to dispose of the exceptions the more intelligibly, and that their relevancy to the real issues may the more readily appear.   The testimony took a very wide range and is very voluminous, and the case was evidently tried with great care and unusual deliberation, and presented to the jury in the very strongest light by the very able counsel on both sides; and the verdict will not be disturbed unless there was manifest error of law in the rulings of the court.

A very large part of the testimony related to the conduct of the plaintiff in placing this horse upon the trotting track in Pennsylvania, and to the proceedings of the Oil City Driving Park and of the National Trotting Association in its expulsion, which was entirely irrelevant to the issues in the case. No evidence in respect to either was admissible, except to show the condition and standing of the horse, and the circumstances in which it was placed at the time of the pretended sale, for the sole purpose of aiding in the construction of the contracts and of the real understanding of the parties to these transactions; and for this purpose nothing was relevant except the mere fact that the horse had been expelled upon charges which both the plaintiff and defendants treated as groundless.   This is the only fact pertinent to the theory of the plaintiff, that the sale was only an apparent one and for the sole purpose of having the defendants procure a reinstatement of the horse, or to the theory of the defendants, that the plaintiff's conduct at the time of the sale estops him from denying that Ford owned the horse and sold it to them for a valid consideration.

Yet, strange to say, not only is all of this irrelevant testimony gone into with the utmost particularity, which must have consumed days of time, but outside issues of fact were formed, upon which still more foreign evidence was sought to be taken, and was admitted or rejected by the court as it ap-

peared to be relevant or otherwise to such remote issues, no matter how irrelevant it might be to the real issues in the case; and, as we shall see, very many of the exceptions are based upon the rejection of some of the items of this testimony. The ethics of horse-racing, or the proceedings of the self-constituted tribunals of the race track, have nothing whatever to do with this case.

The exceptions are very numerous, but we will endeavor to dispose of them all as briefly as a satisfactory disposition of them will admit: *First*, the amendment of the complaint, in changing the alleged value of the horse from $3,000 to $6,000, was, in the then condition of the case, an amendment as of course, like the *ad damnum* in trover or *assumpsit*, and was not of an issuable fact. *Second*, the fifteen several objections to evidence relating to what the plaintiff did, or to what took place at the races at Oil City and other places, were well taken, on the ground that the evidence sought was irrelevant and immaterial. *Third*, the question, " Were you expelled along with the horse? " was asked of the plaintiff directly after he had testified, " If folks knew I was expelled, and I owned the horse, they wouldn't re-instate him. I said, I didn't care about being re-instated myself." This was sufficient evidence that he had been expelled, without a repetition; and it was afterwards proved by record evidence that he had been expelled; so that this exception is immaterial. *Fourth*, the question, whether the plaintiff had stated a falsehood in telling people that *Sherman* and *Reynolds* owned the horse, was merely impertinent, after the witness had already testified that he had so told people, but that in fact he owned the horse, and they did not. *Fifth*, the question to the plaintiff, " whether he had not on one occasion taken another name than his own," related to what took place at the Oil City race, as shown by subsequent questions as to the name in which the horse was then entered, and, as we have already seen, was immaterial. *Sixth*, the questions addressed to J. F. McKesson,

" whether he had been charged before a justice of the peace, upon a written complaint, with having forged his brother's name, and whether he had been arrested," had already been answered in the negative, in substance, by the witness saying, " I don't know as I have ever been arrested. No criminal charge was ever preferred against me that I know of. I was not charged with forging my brother's name to a note." Besides this, it was not sought to prove a conviction of an infamous crime to impeach the witness, and a *charge* of crime is not in itself impeaching evidence. *Seventh,* the question put to the witness Herron, as to what the defendant *Reynolds* said to him about what he would sell the horse for, was objectionable as not being cross examination, and as eliciting the statements of a party defendant in his own favor; and *eighth,* the questions put to the witness Twist, as to conversation with the defendant *Reynolds* in relation to shoeing the horse, in the absence of the plaintiff, were objectionable for the same reason. *Ninth,* the cross-interrogatory in the deposition of Conley, asking his opinion of the value of the horse in November, 1878, upon a hypothesis of its speed at different races, was objectionable as making a remote and collateral issue upon the hypothetical facts, and there being no evidence to support it, and as being immaterial by reason of the time stated. *Tenth,* the testimony of the witness Twist, not asked for, that the plaintiff stated that he would sell the horse for $2,000, and the question put to the witness Brown, what the plaintiff in 1878 said he would accept for the horse, and other testimony offered to prove that the plaintiff offered to sell the horse at any particular price long before the time he was demanded of the defendants and of the bringing of this suit, were objectionable as being too remote and collateral to have any bearing upon the main fact to be proved — the real value of the horse in March, 1879. 1 Greenl. on Evidence, §§ 51, 52. The plaintiff would not be estopped by such admissions if made at the proper time. Id., § 202. *Eleventh,* the question to the wit-

ness Thorne, of the value of the horse in 1878, upon a hypothesis of his record as a trotter, was properly rejected, for reasons heretofore stated. *Twelfth*, the defendants offered to prove that they tendered the plaintiff $2,000 in payment of the note; and it was properly rejected, as not going far enough to prove a tender in court, and because no tender is alleged in the pleadings, and a tender of such payment was immaterial to the issue. *Thirteenth*, the questions to defendant *Reynolds*, whether on his part and on the part of *Sherman* the purchase of the horse was *bona fide*, and what was the intention of the parties, so far as he knew, as to the sale being real or colorable, were objectionable, because the witness was not competent to state what was the intention of others in the matters stated. *Fourteenth*, the plaintiff stated, as a witness, that about the time of the pretended sale a receipt was given, and the counsel of the plaintiff demanded of the defendants the production of that receipt. They produced the paper already alluded to. Then the plaintiff was asked to state what were the contents of the paper that he called a receipt, as read to him by the defendant *Sherman*; and this was objected to, and the objection overruled. This objection appears to have been based upon the reasons that the receipt itself was the best evidence, and should have been first introduced, and was itself conclusive of its contents, and that it could not be varied or contradicted by parol testimony.

It is quite apparent that none of these reasons were applicable to the question. The court did not know that the paper furnished was the receipt referred to by the witness, and it was, in fact, an agreement rather than a receipt, and radically different from that described by the witness; and no good reason is perceived why any instrument may not be attacked as fraudulently obtained, even before and in anticipation of its introduction by the opposite party. The authorities cited on this point by the learned counsel for the appellants are unquestionable in a proper case, but have no application to the

McKesson vs. Sherman and another.

question here presented. When this receipt or agreement was afterwards introduced, the evidence became and was applicable to it, and both the instrument and the testimony of the plaintiff in explanation of it were then properly before the jury. The fact sought to be proved by this evidence was, that any paper not of the import and meaning stated by the plaintiff as a witness, was fraudulently misread to him, when he was unable to read it himself, and therefore not binding upon him; and it is certain that no such instrument as described by the plaintiff was either present in court or ever introduced afterwards, but only one of radically different import.

These appear to be all of the exceptions found in the record in respect to the introduction of evidence. We have been compelled to consider each one, by the learned counsel of the appellants *insisting* upon each, as involving an erroneous ruling of the court, although not all of them were specially noticed in their brief; and to do so we have been compelled, with much labor, to gather them as they are scattered throughout the printed case. We might, perhaps, as well have grouped these exceptions together and have decided them all unfounded, as they all appear to be of nearly the same merit; but, out of respect to the learned counsel, we have considered each one separately, except where many of them were substantially of the same character.

At the close of the testimony, leave was asked by the learned counsel of the defendant *Sherman*, to amend his answer by inserting in his behalf, also, the matter of estoppel of the answer of *Reynolds*; and such request was not granted. This was quite likely within the discretion of the court, but, as the jury found adversely to the matter of estoppel so far as the defendant *Reynolds* was concerned, the defendant was not prejudiced by this ruling.

The charge of the court to the jury was very full and fair, and appears to have embraced the substance of all of the instructions asked in respect to all matters of law material and pertinent

to the case; and the exceptions relating to both are clearly un-
tenable, except two, which are, perhaps, sufficiently plausible
to merit special consideration. *First*, the jury were instructed
as follows: " The paper which has been introduced in evidence
on the part of the defendants, and styled by counsel 'the re-
ceipt for the note,' does not purport to transfer, and does not
transfer, the title of the horse to the defendants, and the defend-
ants can found on it no right or property in the horse as pass-
ing to them by virtue of the execution of such a paper."
This was in effect telling the jury that such a receipt was not
and did not purport to be a *conveyance* of the horse, and so
the jury must have understood. This meaning of the instruc-
tions is obvious from a similar meaning of the instructions re-
lating to the legal effect of the admissions of the plaintiff in
near connection with this, that such admissions " could not
have the effect to *transfer* the title of the horse, or in any
way change his ownership. Such a transfer of the title could
take place only by the agreement of the parties with each
other." It is true, the jury were not specifically instructed
that they might consider the *receipt* as tending to prove that
the defendants had purchased the horse, but they were in-
structed that "such *admission*, if made by the plaintiff, is
proper evidence for you to consider, as tending to prove a pre-
vious sale of the horse to the defendants;" and so the jury
might well have understood they could also consider the "re-
ceipt " as tending to prove the same thing.

The court was asked to instruct the jury that "if, from the
evidence, they believed that the plaintiff and the defendants
agreed to have the title placed in the defendants, in order to
impose upon the National Trotting Association and make them
believe the title had passed to said defendants, in order to re-
instate said horse, and that, pursuant to such pretended sale,
the possession of said horse was delivered to and held by the de-
fendants, and that they held the possession under such agree-
ment up to the time said horse was replevied, the jury must

find for the defendants." The court instructed the jury on this point as follows: "It is claimed that the transaction by which the defendants became possessed of the horse in controversy, was designed to deceive and mislead the National Trotting Association. If you find that such was its design, such design or intention does not affect the quality of the transaction as between the parties to this action, and would not preclude the plaintiff from asserting in a court of justice, against these defendants, any rights which he might have, growing out of such a transaction." The instruction asked, as well as that given, fall very far short of defining a transaction entered into by the parties with the design or intention of accomplishing an illegal or fraudulent purpose, or any purpose which was not strictly just and proper. There is no evidence in the case tending to show that anything wrongful was intended by either party in having the horse reinstated, and both parties claim throughout the case that the horse had been wrongfully expelled by the National Trotting Association, and that proper measures should be honestly taken to have it rightfully restored. The transaction in this respect was not illegal or fraudulent in any sense, and the instruction does not so imply, and the decision of this court in *Winslow v. Crowell*, 32 Wis., 639, is conclusive that such an intended deception does not amount to a fraud which would vitiate the contract.

The real issue in this case is quite limited, and, if it had been constantly kept in view on the trial, much of the evidence and many of the instructions would not have been found in the record. The plaintiff claims that the defendants procured the nominal and apparent title to the horse by the pretext and for the ostensible purpose of having it re-instated for his benefit, but with the real and fraudulent design of defrauding him of it by claiming it as their own by *bona fide* purchase; and the defendants claim that they became the *bona fide* purchasers of the horse, and for a valuable consideration, and that they are the real owners. To this simple issue all of the evi-

dence should have been directed and confined, and to it the instructions should have been applicable. We find no error in the rulings of the circuit court.

It may be that the jury placed a high estimate on the value of the horse in their assessment of the damages; but we are unable to say that it is excessive or not warranted by the evidence.

*By the Court.*— The judgment of the circuit court is affirmed.